**UNITED STATES of America, Plaintiff,**

v.

**NARRAGANSETT IMPROVEMENT COMPANY, Defendant.**

Civ. A. No. 79–0210.

United States District Court,
D. Rhode Island.

July 17, 1983.

Edward C. Sanmartino, Providence, R.I. and John C. Hammock, Environmental Enforcement, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

John R. Allen, Providence, R.I., and Gregory Benik, Providence, R.I., for defendant.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

Plaintiff, United States of America, brings this action against Narragansett Improvement Company (the Defendant) pursuant to § 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b) (Supp. I 1977). Plaintiff alleges that Defendant has failed to comply with the New Source Performance Standards (NSPS) promulgated by the United States Environmental Protection Agency (EPA), in violation of § 111(e) of the Clean Air Act (the Act). *See generally* 40 C.F.R. Part 60. In addition, Plaintiff contends that Defendant has violated § 114 of the Clean Air Act, 42 U.S.C. § 7414 (Supp. I 1977), by refusing to comply with EPA written directives to sample its air emissions. Plaintiff seeks injunctive relief and civil penalties for these alleged violations.

Defendant, Narragansett Improvement Company, contends that its facility is not a "new source," as that term is used in § 111 of the Clean Air Act, 42 U.S.C. § 7411, and in the regulations promulgated thereunder. Defendant asserts that the New Source Performance Standards do not apply to its facility. The Court accepts and substantially adopts the reasoning and arguments advanced by Defendant.[1]

Narragansett Improvement Company, a Rhode Island Corporation, is engaged in the manufacture and sale of asphalt concrete.

---

1. As will more fully appear hereafter, Plaintiff has achieved that much discussed but rarely attained result of snatching defeat from the jaws of victory.

Defendant has operated an asphalt concrete plant at its 223 Allens Avenue location in Providence, Rhode Island since at least World War II. The production of asphalt concrete involves drying and heating sand and gravel aggregates and mixing measured portions of these heated aggregates with hot liquid asphalt. Wet aggregate is delivered to the plant and placed in bins for storage. The wet aggregate, as required, is fed by conveyor to a dryer, where it is dried and heated. Since 1974, Defendant has burned waste fuel oil in the burner used in connection with the rotary dryer. The waste oil is filtered to remove some of its impurities and heated prior to use to remove excessive water. An additive is then included to promote better combustion. Following the drying process the aggregate is moved by a bucket-conveyor (elevator) system to the top of the mixing tower. In the mixing tower the aggregate passes through screens which separate by particle size. The aggregate is then dumped into separate hot bins, according to size. The aggregate is stored in these bins until a "batch" of asphalt concrete is needed. At such time the aggregate, in various sizes, is weighed in a weigh hopper, according to the specifications of the order, and dumped into the mixer. Hot liquid asphalt is then added to the aggregate and mixed. After mixing, the batch is dropped into a truck situated underneath the mixing tower. The asphalt concrete hardens quickly in cool temperatures, limiting the production season to late March through November.

The manufacturing process of asphalt concrete produces air emissions consisting of dust particles. The dryer is the first significant potential source of particulate matter pollution in the plant. The hot elevator, the screens and the weigh hopper are also potential sources of particulate matter pollution. The dust generated from these sources is first ducted through the primary cyclone, which removes the larger particles. The remaining dust then moves to the baghouse which filters the polluted air before allowing it to be emitted into the atmosphere.

The Narragansett Improvement Company asphalt concrete plant is comprised of the following components: a rotary dryer; a mixing tower; an elevator; storage facilities for the sand and gravel aggregate; a conveyor system for the feeding and transfer of the sand and gravel aggregate, and the hot asphalt; storage facilities for the hot asphalt concrete; and pollution control equipment. The pollution control equipment consists of a primary cyclone and a fabric filter dust collector, known as a "baghouse."

Between June 11, 1973 and July 15, 1974, Narragansett Improvement Co. replaced its rotary dryer and its mixing tower and substituted its existing air pollution control equipment, an electrostatic precipitator, for a filter baghouse. The new components were integrated with the existing elevator, raw material storage and handling equipment, and hot asphalt storage system. The machinery and equipment which were not replaced are necessary components of an asphalt concrete plant. The cost of the new equipment was approximately $337,000. The cost of the additional parts and equipment, which are an integral part of Defendant's plant but were not replaced in 1973–1974, was about $300,000.

The 1973–1974 replacement activity did not result in a material increase in the production capacity of Defendant's plant, or in any increase in the amount or type of air emissions from that facility. No evidence was introduced at trial which would indicate that Defendant's plant exceeds the NSPS emission limitations, found at 40 C.F.R. § 60.92.

Defendant follows a program of capital improvements whereby a major component of the asphalt concrete plant is replaced annually. Since 1974, Defendant has twice replaced the cyclone portion of the air pollution control equipment, and has replaced the dryer and the entire baghouse. Moreover, Defendant replaces all bags and their frames every winter and as necessary throughout the production season.

A chain of correspondence between the EPA and the Defendant was started on

July 1, 1974. The Chief of the Air Branch of the Regional EPA office informed the Defendant, by letter, that the federal regulations for new sources of air pollution may apply to its asphalt concrete plant. Mr. Kirke Everson, the President of the Narragansett Improvement Company, replied on July 24, 1974. That letter detailed the extent of the work at Defendant's plant and expressed Mr. Everson's belief that equipment replacement would not bring the Defendant company within the definition of a "new source."

The EPA Regional Counsel advised Mr. Everson, by letter dated January 24, 1975, that the modification of the asphalt concrete plant placed the Defendant company under the New Source Performance Standards (NSPS), pursuant to § 111 of the Clean Air Act. Specifically, Defendant company was determined to be subject to the Standards of Performance for New Stationary Sources for asphalt concrete plants, delineated at 40 C.F.R. § 60. Mr. Everson was so advised despite an internal EPA memorandum, dated October 9, 1974, which noted that "it is probable that the renovations to the plant have actually resulted in a decrease in net particulate emission rate . . .".

Mr. Everson, by letter dated February 26, 1975, requested a redetermination of the EPA decision. The changes made in the asphalt concrete plant were again recited. Mr. Everson further contended that the replacements did not increase the air pollutants emitted by the asphalt concrete plant. The Regional Director for the Enforcement Division of the EPA responded on April 22, 1975. That letter reaffirmed the decision to regard the Defendant company as a new source. The EPA informed Mr. Everson that a proposed regulation, 40 C.F.R. § 60.-15, which dealt with "reconstruction" of existing facilities "irrespective of any change in emission rate" was applicable to Defendant's facility. Enclosed with the letter from the EPA was a copy of the Director of the Division of Statutory Source Enforcement's determination, which concluded that Defendant's plant was subject to the New Source Performance Standards.

Letters, dated May 19, 1975, January 12, 1977 and September 9, 1977, were sent from the Regional Director of the Enforcement Division to the President of the Defendant company. All three letters restated the EPA's determination that Defendant's facility was to be considered a new source and, as such, subject to the New Source Performance Standards. Included in the correspondence were details of actions required of Defendant company to determine its compliance with the applicable regulations. The suggestion of filing a complaint against Defendant for violations of the Clean Air Act first emerged in the September 9, 1977 letter.

The EPA's firm intention to proceed with an enforcement action against Narragansett Improvement Company was communicated to Mr. Everson, by certified mail, on October 19, 1978. The Regional Director cited the failure of the Defendant company to perform emission testing, to prove compliance with the New Source Performance Standards, as the basis of the enforcement action. The United States, at the request of the Administrator of the Environmental Protection Agency, filed this civil enforcement action on April 18, 1979.[2]

2. On November 26, 1982 this Court filed an Opinion in this action.

The Court held that final action, with respect to the new source designation, had been taken by the EPA after the effective date of the 1977 amendments to the Clean Air Act. This Court concluded that, in light of the amended jurisdictional requirements of §§ 307(b)(1) and 307(b)(2) of the Clean Air Act, 42 U.S.C. §§ 7607(b)(1) and 7607(b)(2), it lacked jurisdiction to review the EPA's final action. As such, the Court accepted the EPA's new source determination. The amended statute provides that the appropriate Court of Appeals is the proper forum in which to challenge final EPA action. Defendant's appeal to the First Circuit, challenging the designation of its facility as a "new source," was time barred.

Plaintiff and Defendant have filed Motions for Reconsideration. Both parties now assert that either the EPA has not yet taken final action in this matter, or, that final action took place before the effective date of the 1977 amendment. Under either alternative review of the EPA's determination in this Court is not barred under §§ 307(b)(1) and 307(b)(2). In

Representatives of the EPA visited and inspected Defendant's plant on numerous occasions. Defendant permitted such visits and cooperated fully with all inspectors. Despite having access to the facility Plaintiff did not conduct performance tests that would have precisely measured air emissions. Plaintiff did not submit the results of any visual opacity test relating to the asphalt concrete plant. Such tests, which measure emissions by visual observation of the gasses coming from the stack, could easily have been performed from on, or nearby, the site of Defendant's plant. The only visual opacity test in the record was conducted by Defendant's experts. The only available air emission evidence indicates that the emissions from Defendant's facility were well within the standards specified by the State of Rhode Island. Further, the unrebutted evidence establishes that, at the time the test was performed, Defendant's emissions met the requirements demanded of asphalt concrete plants under the New Source Performance Standards.

Designation of an operation as a new source results in increased burdens being placed upon the facility. The New Source Performance Standards for asphalt concrete plants are more stringent than the Rhode Island standards for equivalent existing sources. A company subject to the New Source Performance Standards must perform emission testing on its facility to assure compliance with the new standards. The cost of such determination must be borne by the new source. The EPA estimates that the cost of emission testing ranges from $3,000 to $10,000.

The issue is whether the renovation of Defendant's facility, which was completed by July 15, 1974, made the plant a "new source" as defined in § 111(a)(2) of the Clean Air Act. The governing version of the Act is the statute that was in effect prior to the Clean Air Amendments of 1977.

The term "new source" is defined in § 111(a)(2) of the Act as:

[A]ny stationary source, the construction or modification of which is commenced after publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source.

At the time the refurbishment of Defendant's facility commenced, on June 11, 1973, only two categories of stationary sources were to be considered "new sources." The regulations and proposed regulations designated newly "constructed" or "modified" plants as new sources, subject to the New Source Performance Standards. A third category of new sources, "reconstructed" facilities, was first proposed on October 15, 1974, three months after Defendant's repair work was completed. A reconstruction regulation, 40 C.F.R. § 60.15, became effective seventeen months after the completion of Defendant's improvements.

Plaintiff promotes three independent theories to bolster its contention that Defendant's asphalt concrete facility is a "new source." First, it is asserted that the 1974 repair and replacement activities constituted a "construction" of a stationary source which commenced after the publication of the applicable New Source Performance Standards. Second, Plaintiff contends that the repair and replacement activities undertaken at Defendant's facility in 1974 constituted a "modification" of a stationary source which commenced after the publication of the applicable New Source Performance Standards. Finally, Plaintiff argues that the 1974 repair and replacement activity at Defendant's plant resulted in a "reconstruction" of a stationary source as defined by the EPA's reconstruction regulation found at 40 C.F.R. § 60.15. Each theory will be individually analyzed.

■ Plaintiff claims that the replacement of numerous major components in De-

light of the compatible motions for Reconsideration this Court has deemed it necessary to reconsider its earlier decision. Upon reconsideration of the now agreed upon facts, the Court concludes that judicial review of the EPA's determination may appropriately take place in this forum.

fendant's asphalt concrete facility constituted a "construction" of a new source for purposes of § 111 of the Clean Air Act, 42 U.S.C. § 7411. Defendant contests the appropriateness of classifying the refurbishment of its facility as construction. Defendant strenuously argues that the term "construction" does not apply to the replacement activities undertaken at its plant in 1974. The language of the relevant statute, case precedent and the pertinent legislative history overwhelmingly support Defendant's position.

The word "construction" is not defined within the relevant provisions of the Clean Air Act. "Construction," however, is a word in common use, and has an ordinary every day meaning. Neither a court nor the EPA can ignore the plain meaning of a statute, *Alabama Power Company v. Costle,* 636 F.2d 323, 358 (D.C.Cir.1979). "Construction," as defined by *Black's Law Dictionary* (Rev. 4th Ed.) means "the creation of something new, as distinguished from the repair or improvement of something already existing ...". The plain meaning of the word "construction" supports Defendant's interpretation of § 111 of the Clean Air Act.

Numerous courts have considered the meaning of the term "construction" in resolving a question of statutory interpretation. The uniform conclusion is that "construction" imports the creation of something new and original that did not exist before. *See, e.g., Muirhead v. Pilot Properties Commission,* 258 So.2d 232, 233 (Miss. 1972); *Commonwealth v. McHugh,* 406 Pa. 566, 567, 178 A.2d 556, 558 (1962); *Olney v. Hutt,* 251 Iowa 1379, 105 N.W.2d 515 (1960). In light of the plain meaning of the word, and the unanimity of Courts' interpretation of the term, the "construction" of a new source under the Clean Air Act means the building, creation or erection of something new. The term does not refer to the repair or improvement of something already existing. Further, Congress, by including modification provisions, expressly legislated standards relating to repairs to, or improvements of, plants. *See* §§ 111(a)(2) and 111(a)(4) of the Clean Air Act, 42 U.S.C. §§ 7411(a)(2), 7411(a)(4).

■ A review of the legislative history of the Clean Air Act reveals that a primary factor in adopting provisions for New Source Performance Standards was to limit the impact of newly constructed plants, and future air pollution sources, on air quality. Congress sought to prevent new air pollution problems. *See* S.Rep. No. 91–1196, 91st Cong. 2nd Sess. (1970); reprinted at *A Legislative History of the Clean Air Act Amendments of 1970* (2 vols) Serial No. 93–58, U.S. Govt. Printing Office, Washington, D.C. (January, 1974), Vol. 2. p. 415, (hereinafter referred to as Legislative History). The D.C. Circuit Court of Appeals has observed:

> The legislative history of § 111 of the Clean Air Act, as amended, 42 U.S.C. § 1857 C–6 (1970), reveals that Congress was most concerned that new plants—new sources of pollution—would have to be controlled to the greatest degree practicable if the national goal of a cleaner environment was to be achieved.

*Essex Chemical Corporation v. Ruckelshaus,* 486 F.2d 427, 434, n. 14 (D.C.Cir. 1973), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1979).

Senator Jennings Randolph, Chairman of the Senate Public Works Committee, stated his understanding of the purpose of the new source standards as follows:

> The overriding purpose of performance standards for new stationary sources is to prevent the occurrence of new air pollution problems. These standards will insure that when an industry moves into any area with low pollution levels, that this new facility does not appreciably degrade the existing air quality. The first plant in a new area must meet the same standards of performance as subsequent plants, thus spreading the responsibility equally among all facilities for maintaining clean air.

*2 Legislative History* 289.

The Senate version of the Clean Air Act, S. 4358, originally contained a definition of the term "construction" which is virtually

identical to the interpretation adopted by Plaintiff. The provision read: " 'construction' means any placement, assembly or installation of facilities or equipment ... at the premises where such equipment will be used, including preparatory work at such premises." S. 4358, *Senate Report* No. 91–1196 at 24. The original "construction" definition was not included in the bill enacted by Congress. The deletion of this definition represents a policy determination by Congress that existing plants were to be "grandfathered" and, hence, not subject to the New Source Performance Standards. *See Alabama Power Company v. Costle,* 636 F.2d at 400.

The plain meaning of the statutory language, judicial interpretations of the term "construction" and the applicable legislative history all illustrate that mere renovation activity does not constitute the construction of a new source under § 111 of the Clean Air Act. The Court is cognizant of the "great deference" which must be afforded to the interpretation of an act by an enforcing agency. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *see also, Youakim v. Miller,* 425 U.S. 231, 235–236, 96 S.Ct. 1399, 1402, 47 L.Ed.2d 701 (1976). In this instance the EPA has interpreted "construction" to encompass repairs, replacement and renovation activity. The interpretation of "construction" advanced by the EPA is plainly erroneous. *Udall v. Tallman,* 380 U.S. at 17, 85 S.Ct. at 801–802.

The repair and replacement activities undertaken at Defendant's plant in 1974 were integrated into an existing facility. The asphalt concrete facility continued to operate at the same location, a site that had been used for decades. A new plant was not fabricated; renovations of an existing facility were performed. Therefore, the improvements to Defendant's asphalt concrete plant did not constitute a "construction" of a new source under the Clean Air Act.

Plaintiff alternately asserts that the renovation of the asphalt concrete plant constituted a "modification" of Defendant's facility. A "new source" as defined in § 111(a)(2) of the Clean Air Act includes any stationary source the "modification of which is commenced after publication" of regulations or proposed regulations prescribing new source performance standards. Section 111(a)(4) of the Clean Air Act defines "modification" as follows:

> The term "modification"; means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.

It is apparent that Congress did not intend the scope of the modification provision to encompass every alteration to, or change in the operation of, an existing source. Physical changes made to, or changes in the method of operation of, a stationary source constitute a "modification" *only* when changes result in an increase in the amount or type of air pollutants emitted by that source. In *ASARCO, Incorporated v. Environmental Protection Agency,* 578 F.2d 319 (D.C.Cir.1978), the court considered the distinction between "new sources" and "existing sources" under the Clean Air Act. The court noted:

> The statute thus directs that NSPS are to apply to any building, structure, facility, or installation which emits or may emit any air pollutant and which is either (1) newly constructed or (2) physically or operationally changed in such a way that its emission of any air pollutant increases.

> \*    \*    \*    \*    \*    \*

> Under the provisions of the regulations that are not challenged in this litigation, the operator of an existing facility can make any alterations he wishes in the facility without becoming subject to the NSPS as long *as the level of emissions from the altered facility does not increase.* (Emphasis in the original).

*ASARCO,* 578 F.2d at 328.

Therefore, in order to prove that there has been a statutory "modification" of a stationary source, there must be evidence that the physical changes to that source resulted

in an increase in the amount or type of its air pollution emissions.

Plaintiff has failed to produce any evidence which demonstrates that the 1974 replacement of component parts at Defendant's plant resulted in any increase in emitted pollutants. Neither pre-renovation, base-line, emission figures or the results of any post-replacement tests were submitted by Plaintiff. In fact, the EPA recognized that the 1974 changes in Defendant's facility probably resulted in a net *decrease* in the particulate emission rate. Thus, the changes made to Defendant's asphalt concrete operation do not constitute a "modification" of that facility, under § 111 of the Clean Air Act.

Finally, Plaintiff alleges that Defendant's facility must comply with the New Source Performance Standards, as the 1974 renovation activity constituted a "reconstruction" of a stationary source. On October 15, 1974, the EPA first published a proposed reconstruction regulation. 39 Fed.Reg. 36946 (October 15, 1974). Under the proposed regulation a "reconstruction" of an existing facility would occur "irrespective of any change in emission rate" upon the replacement of a "substantial portion of the existing facility's components." *Id.* at 3649. The regulation was revised and published as a final regulation on December 16, 1975. 40 Fed.Reg. 58416 (December 16, 1975). As revised, the reconstruction regulation provides, in pertinent part, as follows:

60.15 *Reconstruction*

(a) An existing facility, upon reconstruction, becomes an affected facility irrespective of a change in emission rate.

(b) "Reconstruction" means the replacement of components of an existing facility to such an extent that:

(i) The fixed capital cost of the new components exceeds 50 percent of the fixed capital cost that would be required to construct a comparable entirely new facility.

Plaintiff asserts that the revised reconstruction regulation applies to the renovation of Defendant's plant, and subjects Defendant to the requirements of the New Source Performance Standards.

Defendant maintains that classification of the renovation work as a "reconstruction" of an existing source is an impermissible retroactive application of the regulation. Defendant concedes that the capital cost of the replacement components installed at its asphalt concrete facility exceeded fifty percent of the fixed capital costs that would have been required to construct a comparable new facility. The installation of all such new equipment, however, was completed by July 15, 1974. In March of 1974 final regulations applying the New Source Performance Standards to asphalt concrete facilities were promulgated. Existing asphalt concrete plants were to be subject to the new standards *only* if changes in the facilities resulted in increased emissions of pollutants. The regulation dealing with a "reconstruction" was publicly noticed on October 15, 1974, three months after the completion of the refurbishment of Defendant's plant. The reconstruction regulation did not become effective until seventeen months after Defendant's improvements were completed. Thus, Defendant contends that the reconstruction regulation cannot be applied retroactively to affect its status as an existing source.

██ It is well settled that in the absence of clear expressions to the contrary legislation is to be construed to avoid retroactive application. As stated by the Supreme Court in *Union Pacific Railroad Co. v. Laramie Stock Yards Co.,* 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913), "the first rule of construction is that legislation must be considered as addressed to the future, not to the past ... [and] a retrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature'." *See, Claridge Apartments Co. v. Commissioner,* 323 U.S. 141, 164, 65 S.Ct. 172, 185, 89 L.Ed. 139 (1944). This "first rule" of statutory construction also pertains to new regulations of administrative agencies.

*Thorpe v. Housing Authority of Durham,* 393 U.S. 268, 282, 89 S.Ct. 518, 526, 21 L.Ed.2d 474 (1969); *Greene v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964); *Miller v. United States,* 294 U.S. 435, 55 S.Ct. 440, 79 L.Ed. 977 (1935).

■ The decision to apply legislation, or a regulation, retroactively must be carefully considered. Initially, the "retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles." *SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1581, 91 L.Ed. 1995 (1947). Recent decisions considering retrospective enactments have all adopted a balancing approach. *See, e.g. Iowa Power and Light Co. v. Burlington Northern, Inc.,* 647 F.2d 796, 812 (8th Cir.1981); *Phillips Petroleum Co. v. Department of Energy,* 449 F.Supp. 760, 797 (D.Del.1978), *aff'd sub nom Standard Oil Co. v. Department of Energy,* 596 F.2d 1029 (Em.App.1979); *California v. Simon,* 504 F.2d 430, 438–39 (Em.App.1974). To determine whether the reconstruction regulation may be applied retroactively the public interest in the regulation must be balanced against the private interest that would be overturned by its retrospective application. *Adams Nursing Home of Williamstown, Inc. v. Mathews,* 548 F.2d 1077, 1080 (1st Cir.1977). The factors which are weighed in the balance in making this determination have been succinctly summarized in *Retail, Wholesale and Department Store Union v. NLRB,* 466 F.2d 380, 390 (D.C.Cir.1972):

> (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite reliance of a party on the old standard.

An examination of these considerations reveals that a retroactive application of the reconstruction regulation would result in manifest injustice, and is unwarranted. *See Thorpe v. Housing Authority of Durham,* 393 U.S. 268, 281–282, 89 S.Ct. 518, 525–526, 21 L.Ed.2d 474 (1969).

The reconstruction regulation represents an abrupt departure from the established statutory scheme that defined new sources and the applicability of the New Source Performance Standards. Prior to the adoption of the reconstruction regulation, the EPA's stated policy was that the New Source Performance Standards would apply to existing asphalt concrete plants "only if a physical change in the plant or change in the method of operating the plant causes an increase in the amount of air pollutants emitted." 39 Fed.Reg. 9310 (March 8, 1974). In 1974 no reference can be found in the Clean Air Act, or in any EPA pronouncement, which stated or implied that a capital expenditure test was to govern the applicability of the new standards to existing sources. Indeed, the first suggestion that replacement of a certain percentage of the total capital costs of a facility would trigger the applicability of the New Source Performance standards is found in the reconstruction regulation, promulgated in December, 1975. The reconstruction regulation does not simply clarify existing EPA policy. Rather, adopting the new regulation constituted a completely new and entirely different approach in applying the New Source Performance Standards to existing sources.

In undertaking the 1974 replacement activity, the Defendant reasonably relied upon the existing law. The EPA had expressly pronounced that repair and replacement of component parts at an existing facility would not result in the imposition of the New Source Performance Standards, *unless* that activity increased air emissions. Defendant engaged in repair and renovation of its facility, with the reasonable expectation that its plant would not become subject to the New Source Performance Standards. Retroactive application of the reconstruction regulation interferes with

Defendant's legally induced and settled expectations. *See, Shell Oil Company v. Kleppe,* 426 F.Supp. 894, 895, 906–907 (D.Colo.1977), *aff'd sub nom; Shell Oil Company v. Andrus,* 591 F.2d 597 (10th Cir.1979).

Mr. Everson, President of Narragansett Improvement Company, categorically stated that the repair activity would have proceeded in a much different fashion had the reconstruction regulation been in effect in 1974. Mr. Everson specified that Defendant would have limited the capital costs of the plant improvements, so as not to exceed the fifty percent limitation of the reconstruction regulation. Applying the December, 1975 reconstruction regulation to activities completed in July, 1974 deprived Defendant of the ability to manage the replacement of components for its asphalt concrete plant. Such management would have enabled Defendant to remain under the threshold level at which replacements are considered to be a "reconstruction." Defendant's competitors now making alterations can limit the amount of their improvements to avoid going over the percent of capital costs that would change an existing source to a new source under the published reconstruction regulation. It is manifestly unjust to impose the burdens of complying with the New Source Performance Standards upon Defendant's facility. In effect, Defendant is being penalized for its lack of clairvoyance.

Substantial financial and operational burdens would be imposed upon the Defendant through the retroactive application of the reconstruction regulation. The New Source Performance Standards would then be applicable, resulting in more stringent air emissions standards. Defendant would have to comply with the burdensome and costly record keeping, maintenance, testing and monitoring requirements. *See,* 40 C.F.R. §§ 60.7–60.13, § 60.9.

Plaintiff argues that the retroactive application of the reconstruction regulation is justified due to the overwhelming public interest in controlling sources of air pollutants. Plaintiff asserts that the interest in the environment must be the paramount consideration in any balancing test and, thus, tips the scale towards retroactive application of the regulation. Refusal to accord retroactive application of the reconstruction regulation simply means that Defendant will not have to meet the New Source Performance Standards. That does not mean, however, that Defendant will be free to pollute the air with impunity. To the contrary, Defendant will be subject to the environmental regulations of the State of Rhode Island. Moreover, if Defendant alters or changes its plant, or its operation thereof, so as to increase or change its air emission, compliance with the New Source Performance Standards will be required. The interest in applying the New Source Performance Standards to Defendant's facility does not outweigh the prejudice to Defendant's interests.

In urging retroactive application of the reconstruction regulation, Plaintiff would have the Court reach back and attach new legal rights and duties to already completed activities. In 1974 Defendant made improvements to its facility in reliance on the express language of the Clean Air Act, and the explicit pronouncement of the EPA that such repairs would not subject Defendant to the requirements of the New Source Performance Standards. To retroactively apply a reconstruction regulation which was adopted seventeen months after Defendant changed its circumstances, in reliance on the then existing law, is inequitable. In enacting the reconstruction regulation the EPA abruptly departed from its established position on the application of the New Source Performance Standards to existing sources. The application of the reconstruction regulation to Defendant's facility would place substantial monetary and operational burdens on the Defendant. Moreover, in light of existing environmental laws, there is no overwhelming public interest in applying the reconstruction regulation to Defendant. Upon a complete balancing of all relevant considerations, the Court concludes that this reconstruction regulation cannot be retrospectively applied to this Defendant.

Plaintiff has not established that Defendant's facility is a "new source." The 1974 renovation of Defendant's plant did not result in a "construction" of a new source, or the "modification" of an existing source. Further, retroactive application of the reconstruction regulation is not warranted.

As Defendant's plant is not a new source, emissions testing of that facility is not required. The refusal to engage in such testing will not be penalized. Therefore, Plaintiff's prayers for relief and request for civil penalties are denied. Judgment will enter for Defendant for costs.