UNITED STATES of America, Plaintiff,

v.

LOUISIANA–PACIFIC CORPORATION, a Delaware corporation, Defendant.

Civ. A. No. 86–A–1880.

United States District Court,
D. Colorado.

Oct. 30, 1987.

---

Daniel S. Maus, Asst. U.S. Atty., Teresa N. Lukas, Asst. Regional Counsel, U.S.E. P.A., Denver, Colo., Cyrus S. Picken, Jr., Environmental Enforcement Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

William A. Hillhouse, II, Zach C. Miller, Felicity Hannay, Davis, Graham & Stubbs, Denver, Colo., for Louisiana–Pacific Corp.

## MEMORANDUM OPINION AND ORDER

ARRAJ, District Judge.

This is a civil enforcement action brought by the United States of America, as plaintiff, on behalf of the U.S. Environmental Protection Agency ("EPA") for violations of the Clean Air Act, 42 U.S.C. § 7401, *et seq.*, and the regulations promulgated thereunder concerning the prevention of significant deterioration ("PSD")[1] of air quality by the defendant, Louisiana–Pacific Corporation ("LPC"). Plaintiff seeks to enjoin defendant from further alleged violations of the PSD regulations, which are set forth at 40 C.F.R. § 52.21. Additionally, plaintiff seeks the assessment of civil penalties against LPC for alleged violations of these regulations.

The matter is now before the court on cross-motions for summary judgment. The parties have submitted briefs, affidavits, and other documentation in support of their respective positions, and oral argument was heard on October 21, 1987.

## BACKGROUND

Defendant LPC came to Colorado in 1983, with the encouragement of the state government, to establish the industry of waferwood manufacturing.[2] Since that time, LPC has built two waferwood plants in Colorado, the first in Kremmling, and the other near the town of Olathe. The air pollution emissions from these two plants, and the alleged failure by LPC to obtain certain related permits from the EPA, form the basis of the present litigation.

---

1. The PSD program, added to the Clean Air Act by Congress in 1977, is designed to protect areas where the air is relatively clean. It requires that a special permit be obtained before a "major stationary source" of air pollution, or a "major modification" of a major stationary source, may be constructed.

2. Waferwood is a plywood substitute product made of resinated wood chips, or "wafers," which are compressed into boards.

In June of 1983, LPC applied to the Colorado Air Pollution Control Division (APCD) to obtain air emission permits for the Kremmling plant. LPC then commenced construction of this facility in July of 1983. In response to LPC's application, the APCD conducted a "preliminary analysis" of projected air emissions and estimated that the total emissions from the five emission sources[3] at the facility would be 78 tons per year (TPY) for carbon monoxide (CO) and 101.5 TPY for volatile organic compounds (VOCs). After a notice and public comment period, the APCD issued five air emission permits for the Kremmling plant on January 3, 1984.[4] Under these permits, total emissions from all sources at the Kremmling plant were limited to 78 TPY of CO and 101.5 TPY of VOCs.

LPC subsequently applied to the Colorado APCD in October of 1983 to obtain similar permits for its proposed Olathe plant. Then, in November of 1983, LPC commenced on-site construction of this second facility. After the preliminary analysis and the required notice and comment period, the APCD issued permits for the Olathe facility in September of 1984. The conditions of these permits limited total emissions to 78 TPY of CO and 101.5 TPY of VOCs. The APCD amended the Olathe facility permits in May of 1985. The conditions of the new permits allowed for total CO and VOC emissions of up to 112.32 and 116.12 TPY, respectively.

LPC obtained the real property for its Kremmling facility in 1982. A "wigwam burner"[5] and a sawmill were already in existence at the site when the area was purchased by LPC. A permit which allowed emissions of 500 TPY of CO from the wigwam burner was transferred to LPC in August of 1983.[6]

Although LPC maintains that the wigwam burner was not intended to be a part of or operated in conjunction with the new waferboard plant, the former plant manager of the Kremmling facility admitted that waste from the waferwood operation was burned in the wigwam burner. In December of 1984, Mr. Steven Frey of the EPA informed LPC that the pre-existing sawmill and burner constituted a "major stationary source" of air pollutants and that, depending on the outcome of the stack tests, the waferboard facility could be considered a "major modification" of the major stationary source. As a result, LPC quickly ceased operation of the wigwam burner and claims that, by June 4, 1985, it had completely removed that facility.

LPC conducted "stack tests" at the Kremmling waferwood facility in March of 1985. Based upon the results of these tests, the EPA determined that the Kremmling facility was subject to the PSD program and issued a Notice of Violation (NOV) on June 5, 1985. This notice alleged that the Kremmling waferwood facility was a "major modification" (as that term is defined in the PSD regulations) of the wigwam burner. Subsequently, the EPA concluded that the Kremmling waferwood facility itself qualified as a "major stationary source" and issued a NOV to that effect on February 3, 1987.

As with the Kremmling facility, LPC conducted stack tests at the Olathe plant in March of 1985. Based upon these tests, the EPA concluded that the Olathe facility was a "major stationary source" within the meaning of the PSD regulations, and issued a NOV on June 5, 1985. After no PSD permit application for the Olathe plant

---

**3.** The emission sources at the Kremmling facility include (1) a wood-fired "wafer dryer," which dries the wet wood wafers after they are cut, (2) a wood-fired Konus thermal oil heater, which is the heat source for various production processes, (3) the "press vents," which vent vapor and other emissions from the hot presses that compact the resinated wafers into boards, and (4 & 5) two series of sawdust-generating rotary saws used to shape the boards.

**4.** A second permit for the Kremmling facility press vents was issued on April 29, 1985.

**5.** A "wigwam burner" is a tepee-shaped incinerator used to burn wood waste from a sawmill.

**6.** With CO emissions well in excess of 250 TPY, the wigwam burner was itself an existing "major stationary source" of air pollutants as that term is defined in the PSD regulations. 40 C.F.R. § 52.21(b)(1)(i).

was received, the EPA issued an administrative order directing submission of a PSD permit application for that facility.

The administrative order was issued on September 27, 1985. It directed LPC to submit a PSD permit application for its Olathe waferboard facility within 60 days of the effective date of the order. The order was to become effective fifteen days after its issuance. However, due to some oversight, the order was neither dated nor signed when it was issued. The order offered LPC the opportunity for a conference to discuss the violation which was the subject of the NOV. LPC requested such a conference, and it was held on October 23, 1985, at EPA's regional office in Denver. EPA has offered evidence that no one present at this conference mentioned the fact that the administrative order had not been signed or dated.

Several months later, in January of 1986, LPC drafted a PSD permit application. Contrary to the directions in the order, however, LPC submitted the application to the State of Colorado. Later, in August of 1986, LPC submitted a second PSD permit application for the Olathe waferboard facility to the EPA.

## DISCUSSION

■ The Clean Air Act establishes minimum air quality standards to be achieved in all regions of the country. In 1977, Congress amended the Act to establish a program for the "prevention of significant deterioration" ("PSD") of air quality. The PSD statutes and regulations are designed to protect areas of the country where the air is relatively clean. The goal of the program is to prevent the air quality in areas where it exceeds the statutory minimum from degenerating to that level.

To achieve this result, areas of the country where the air is cleaner than required by the National Ambient Air Quality Standards are identified by the states and designated as "attainment areas." 42 U.S.C. §§ 7407, 7471. The attainment areas are further divided into three classes: Class I for areas that have very clean air (such as national parks) where little or no deterioration is permitted; Class II for areas where moderate deterioration of air quality may occur; and Class III for areas where more economic growth and resulting air quality deterioration is allowed. *Id.*, §§ 7472, 7474. The thrust of the PSD program is that new "major emitting facilities" may not be constructed within these areas before certain permits have been obtained. *Id.*, § 7475. The permits, in turn, allow the new facility to contribute to air pollution only up to specified incremental amounts. *Id.*, § 7473(b). Of central importance to this case is the fact that LPC's Kremmling and Olathe facilities are located within attainment areas.

The Clean Air Act provides that "[n]o major emitting facility ... may be constructed in any [attainment area] unless a permit *has been issued* for such proposed facility in accordance with this part setting forth emission limitations for such facility...." 42 U.S.C. 7475(a)(1) (emphasis added). The act further provides that the term "major emitting facility" includes any source with the potential to emit two hundred and fifty tons per year (TPY) or more of any air pollutant. *Id.*, § 7479(1).

The PSD regulations go into a lot more detail and establish the rule that no "major stationary source" or "major modification" of a major stationary source "shall begin actual construction without a permit" which states that the source or modification will meet the emission requirements set forth in the regulations. 40 C.F.R. § 52.21(i). The term "major stationary source" is defined to include any facility which emits, or has the potential to emit, two hundred and fifty TPY or more of any air pollutant. *Id.*, § 52.21(b)(1)(i)(b). A "major modification" is defined as any physical change or change in operation that would result in a significant increase in the emission of any one of several pollutants. *Id.*, §§ 52.21(b)(2)(i), 52.21(b)(23). With regard to the pollutants that are relevant in the present case, a net emissions increase of 100 TPY of carbon monoxide (CO) or 40 TPY of volatile organic compounds (VOCs) would be significant, and thereby constitute a major modification. *Id.*

Permits may be issued only to sources that satisfy two principal requirements. First, the source must demonstrate that emissions from the construction or operation of the facility will not violate any applicable emission standard of the act. 42 U.S.C. § 7475(a)(3). Second, the proposed source must be subject to the best available pollution control technology. *Id.*, § 7475(a)(4). To facilitate its review, the EPA requires that new sources submit air monitoring information necessary to determine the impact on air quality of the proposed source. 40 C.F.R. § 52.21(m). Generally, such monitoring must be gathered one year in advance of submission of the PSD application. The EPA then has up to one year to review and grant or deny the application. 42 U.S.C. § 7475(c). As a result, it may take up to two years before the source is allowed to commence actual construction of the new facility.

Where the EPA determines that the provisions of the Clean Air Act and its implementing regulations have not been complied with, it may issue a notice of violation ("NOV") to the alleged offender. If the alleged violation continues for more than thirty days after the issuance of the NOV, the EPA is then empowered to bring a civil enforcement action. 42 U.S.C. § 7413(b). If a violation is established, the Act authorizes the court to issue a temporary or permanent injunction, or to assess a civil penalty of up to $25,000 per day of violation, or both. *Id.*

## I. *Defendant's Motion on Plaintiff's First Claim for Relief*

The complaint, as originally filed, alleged as the first claim for relief that LPC's Kremmling facility constituted a "major modification" of an existing source and that, as such, LPC should have obtained a PSD permit prior to construction.[7] This claim was based, of course, upon the propo-sition that the pre-existing wigwam burner constituted a "major stationary source." There was some question, from all sides, as to whether such an allegation was proper, since it is undisputed that the burner had been completely dismantled by the time the EPA issued its NOV of June 5, 1985, alleging that the Kremmling plant was a major modification.[8] Consequently, plaintiff was permitted to amend the complaint, adding a first claim for relief in the alternative. The alternate claim alleged that the Kremmling plant itself constituted a "major stationary source" and was therefore subject to the PSD requirements.

The material facts relating to the operation of the wigwam burner are not in dispute. The unit existed on the property before the waferwood facility was built, and continued to be used after the latter became operational. LPC does not dispute that the emissions from the burner were substantial enough to qualify it as a major source, and it admits that waste products from the waferwood facility were disposed of in the burner. LPC ceased utilizing the wigwam burner when it was informed that EPA might consider the new plant to be a major modification, and the unit had been totally dismantled by the time EPA issued its NOV on June 5, 1985.

42 U.S.C. § 7413(b)(2), the provision under which this action is brought, empowers the EPA to bring a civil action only if the agency first issues a NOV and the violation alleged persists for thirty days. LPC moves this court to dismiss plaintiff's first claim for relief, asserting that, as a matter of law, the violation alleged (that the Kremmling plant constituted a "major modification") could not have continued for thirty days since the original major source did not exist during this time. Plaintiff replies that the violation alleged occurred upon the initiation of construction, and that

---

7. Plaintiff's first claim for relief, first claim for relief in the alternative, and second claim for relief are all based on the undisputed fact, noted above, that the Kremmling and Olathe plants are located within "attainment areas."

8. Although plaintiff in its brief disputes this fact, it has chosen not to submit any evidence to the contrary. Since LPC has submitted some evidence (in the form of affidavit) to the effect that the wigwam burner was dismantled prior to the issuance of the original NOV, this fact is established for purposes of summary judgment. Fed.R.Civ.P. 56(e).

the original source was still in operation at that time.

■ Although both parties have briefed and argued their positions on this point with some force, neither side has been able to cite any relevant authority, and the court has similarly been unable to locate any case law bearing directly on this point. Thus, since this portion of defendant's motion raises a novel question of law, I must look to the language and intention of the statute and established principles of statutory construction to resolve the matter. I conclude that the Kremmling facility could not have qualified as a "major modification" for the thirty day period following the issuance of the original NOV and, accordingly, defendant's motion for summary judgment on plaintiff's first claim for relief will be granted.[9]

The regulations define a "major modification" as "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase." 40 C.F.R. § 52.21(b)(2)(i). This language clearly contemplates that a major stationary source must be in existence before any change resulting in an emissions increase can be said to be a modification. Courts should also consider the plain meaning and common usage of words when construing the terms of the Clean Air Act. *United States v. Narragansett Improvement Co.*, 571 F.Supp. 688 (D.R.I.1983). Common sense and the plain meaning given to the term "modification" lead to the same conclusion set forth above, since by definition there can be no modification of something that does not exist.

When the EPA issued the original NOV for the Kremmling plant, the violation alleged was that the plant was a "major modification." Yet, the Kremmling plant could not have been a modification on this date because the original source, the wig-

wam burner, no longer existed. Thus, as a matter of law, the Kremmling plant could not have been in violation as alleged in the NOV on the date it was issued. If the plant was not in violation on this date, it follows that the violation did not continue for 30 days as required by 42 U.S.C. § 7413(b)(2).

Of course, the Kremmling facility may have qualified as a "major stationary source" in its own right on the day the original NOV was issued. The EPA urges that this would constitute a violation of the PSD regulations that continued for the next thirty days. This argument overlooks the fact, however, that such a violation is already addressed by the first claim for relief in the alternative.

■ Additionally, it is clear that the specific violation alleged in the NOV is the violation that must continue for thirty days before the EPA is empowered to bring a civil suit. First, the language of the enabling statute clearly bears this out.[10] Second, to allow the EPA to notify the alleged offender of one violation, and then bring a civil action on the basis that another violation (different than that alleged in the notice) continued for the thirty days following the NOV would completely frustrate the notice requirement created by Congress. Thus, I conclude that before the EPA is authorized to bring a civil enforcement action under 42 U.S.C. § 7413(b)(2), (1) the EPA must issue a NOV to the alleged offender, and (2) the violation alleged must continue for thirty days after the issuance of the NOV.

In support of its position, plaintiff cites the case of *United States v. SCM Corporation*, 667 F.Supp. 1110 (D.Md.1987). In that case, the District Court had already found a violation of the Clean Air Act, and the issue before it was the proper period of violation for purposes of determining the

---

9. Of course, this does *not* dispose of plaintiff's first claim for relief in the alternative.

10. 42 U.S.C. § 7413(b)(2) provides that "[t]he [EPA] may ... commence a civil action ...

whenever [a] person ... violates any requirement of an implementation plan ... more than 30 days after having been notified by the [EPA] ... of a finding that such person is violating *such requirement*" (emphasis added).

appropriate fine.[11] The defendant in that case urged that the violation did not take place until the NOV was issued by the EPA, but the plaintiff (EPA) contended that the violation occurred when the defendant commenced construction without a permit. The court agreed with the plaintiff that the violation occurred when construction was initiated, and not later when the NOV was issued. *Id.*

Plaintiff's reliance on this holding is misplaced. The present case is distinguishable from *SCM Corporation* because in the latter the issue of the EPA's authority to bring the action was never at issue. For purposes of the present case, the *SCM Corporation* decision merely indicates that the violation occurred when LPC commenced construction at Kremmling and not later in June of 1985 when the EPA issued the NOV. LPC does not dispute the charge that the Kremmling plant may have constituted a major modification (and therefore a violation of the PSD regulations) when construction was begun. Rather, it contends that the plant did not constitute a major modification during the 30 days following the issuance of the NOV. Continuance of the violation alleged for at least 30 days (and not merely the violation itself) is the prerequisite to the institution of a civil enforcement action.

EPA also argues that, logically, if a violation occurred when construction was commenced, the EPA must have the authority to bring a civil action based upon that violation even if the violation is later discontinued. Whether or not logic might provide for such a rule, the provisions of the Clean Air Act clearly do not. The fact that a violation must continue for thirty days before the EPA may bring an enforcement action indicates the Congressional decision that the EPA may not be able to bring an enforcement action for every violation that occurs.

Finally, the EPA asserts that granting LPC's motion on this issue will allow future polluters who ignore the PSD require-

ments to go free merely because the EPA notifies them of the wrong violation. While it is conceivable that a future action improperly commenced by the EPA may be dismissed because of today's decision, this should not obscure the fact that this result cannot occur where the EPA gives proper notice. The fact that Congress explicitly provided for notice and a willful continuance thereafter indicates that it intended for the alleged violator to know the nature of the charge against it. An essential prerequisite of this system of notification envisioned by Congress must, therefore, be that the EPA determine the proper violation before ordering the facility in question to take remedial action or cease operations. Today's ruling may help achieve this result.

## II. Defendant's Motion on Plaintiff's First Claim for Relief in the Alternative and Second Claim for Relief

Plaintiff's first claim for relief in the alternative and second claim for relief allege that the Kremmling and Olathe facilities constitute "major stationary sources" which should have obtained PSD permits prior to construction. As noted above, the term "major stationary source" is defined in the PSD regulations to include any facility which has the potential to emit 250 TPY or more of any air pollutant. 40 C.F.R. § 52.21(b)(1)(i)(b). Thus, these claims are based upon the Kremmling plant's alleged potential to emit more than 250 TPY of VOCs, and the Olathe plant's alleged potential to emit more than 250 TPY of CO.

Defendant argues in its motion that these claims should be dismissed. It contends that the Kremmling and Olathe plants could not have been major stationary sources because the conditions set forth in the state permits limited each plant's output of CO and VOCs to levels well below 250 TPY. The essential thrust of defendant's argument, then, is that the conditions contained in the state permits should be considered in determining the "potential to emit."

**11.** 42 U.S.C. § 7413(b) authorizes a civil penalty of up to $25,000 per day for each day of viola-

tion.

The regulations define the term "potential to emit" as

the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable. 40 C.F.R. 52.21(b)(4)

Defendant urges this court to find that the conditions set forth in the state permits are federally enforceable and should therefore be considered a design limitation for purposes of determining the potential to emit. It points out that the term "federally enforceable" means all limitations and conditions which are enforceable by the EPA, including any permit requirements established under the regulations set forth at 40 C.F.R. § 51.18. 40 C.F.R. § 52.21(b)(17).

Defendant's motion on this issue must fail for several reasons. First, the state permits defendant relies upon were not even in existence at the time of the alleged violations. Second, these permits, because they have been revoked and modified since the notices of violation were issued, do not preclude the authority of the EPA to bring suit under 42 U.S.C. § 7413(b)(2). Third, defendant's argument requires too broad a construction of the term "potential to emit."

A. *The State Permits Did Not Even Exist When the Alleged Violations Occurred*

■ The PSD regulations require that the owner or operator of a major stationary source must apply for and obtain a PSD permit prior to beginning construction. These regulations provide that no major stationary source "shall begin actual construction without a permit" which states that the new source will meet the PSD requirements. 40 C.F.R. § 52.21(i)(1). The term "begin actual construction" is defined as the "initiation of physical on-site con-

struction activities on an emissions unit which are of a permanent nature." *Id.*, 52.21(b)(11). Thus, an operator violates the PSD regulations when it begins to lay underground pipework or construct building foundations or other permanent structures for a major source without a PSD permit. *Id.* The regulations state that any owner or operator who begins construction of a major source without applying for and receiving "approval to construct" shall be subject to enforcement action. *Id.*, § 52.21(r). The context of these regulations makes it clear that the violation occurs when the actual construction is commenced, and not at some later point in time. *See also United States v. SCM Corp.*, 667 F.Supp. 1110 (D.Md.1987).

■ In the present case, defendant has failed to submit any evidence to this court going to the issue of when it began construction as that term is specifically defined above. However, it has admitted in general terms (by way of its amended answer) that it "commenced construction" of the Kremmling and Olathe facilities in July and November of 1983, respectively. Moreover, it is not disputed that the state permit for the Kremmling plant was issued in January of 1984, and the permit for Olathe was issued in September of 1984. Since any violation that may have occurred did so when actual construction was begun, these facts make it clear that any alleged violation took place *before* the permit limitations in question ever existed. When viewed in this way, even if the court were to accept the argument that state permit limitations should be considered in determining "potential to emit," such limitations could not be a defense in this case since they did not even exist when the alleged violation occurred.

B. *The State Permits Do Not Preclude the Authority of the EPA to Bring Suit Under 42 U.S.C. § 7413(b)(2)*

Although I have concluded that the limitations contained in the state permits cannot be a defense to the violation alleged in the first alternative and second claims for relief, this finding does not end the matter. The next step in the analysis is whether the permit limitations preclude, as a matter of

law, the authority of the EPA to bring this case under 42 U.S.C. § 7413(b)(2). As previously discussed, this section empowers the EPA to bring a civil enforcement action only if the EPA issues a NOV to the alleged offender and the violation alleged continues for thirty days thereafter. If the state permits upon which defendant relies were continually in place following the issuance of the notices of violation, LPC could argue that these permits prevented the facilities from qualifying as major sources (and thereby prevented them from being in violation of the regulations) for thirty days following the issuance of the notices as required by 42 U.S.C. § 7413(b)(2).

The NOV alleging that the Kremmling facility was a major source was issued on February 3, 1987. Final state permits for this facility were issued on July 20, 1987, and these new permits allowed for emissions of both CO and VOCs that were well in excess of 250 TPY. Since the permits upon which defendant relies were superceded on July 20, 1987, and more than thirty days have passed since then, the limitations contained in the original permits do not prevent the requirements of 42 U.S.C. § 7413(b)(2) from being met as to the Kremmling plant.

With regard to the Olathe facility, the NOV alleging that it constituted a major source was issued on June 5, 1985. The permits defendant relies upon, however, were revoked by the APCD in June of 1985 and were not reinstated until later that year. As a result, the state permit limitations cannot have prevented the Olathe plant from qualifying as a major source for thirty days following the issuance of the NOV because the permits were not in effect at this time. Thus, these permit limitations do not prevent the requirements of 42 U.S.C. § 7413(b)(2) from being met as to the Olathe plant.

C. *Emission Limitations, in Contrast to Physical and Operational Limitations, Are Not to be Considered in Determining the Potential to Emit*

■ Even if the state permits had been in existence when the alleged violation oc-

curred, and even if they had been in effect at all times since the notices of violation were issued, defendant's motion would still have to fail because I cannot accept defendant's overly broad construction of the term "potential to emit." This term is defined as "the maximum capacity of a stationary source to emit a pollutant under its physical and operational design." 52 C.F.R. § 52.21(b)(4). Defendant urges that emission limitations contained in state permits constitute one component of a source's "physical and operational design."

There are several different kinds of restrictions contained in the emission permits issued to LPC by the APCD. These permits place several physical constraints upon LPC's operations at Kremmling and Olathe, including upper limits on the amount of fuel which may be combusted, on the amount of waferboard which may be produced, and on the hours of operation per year. Additionally, the permits contain explicit limitations on actual emissions from several of the various pollution sources within each plant.

It is clear that the former type of limitation (a restriction on hours or materials) is properly included in determining "potential to emit" since such limitations are expressly listed within the definition of that term. LPC in its motion urges that the latter type of limitation (a blanket restriction on actual emissions) must also be considered, and relies upon the undisputed fact that such restrictions, contained in the permits issued by the APCD, limit the output of CO and VOCs for both facilities to levels well below 250 TPY. Thus, the legal issue to be addressed in defendant's motion is whether restrictions on actual emissions are properly considered in determining a source's potential to emit.

Any analysis of the proper construction of the term "potential to emit" must begin with the case of *Alabama Power v. Costle*, 636 F.2d 323 (D.C.Cir.1979). At the time this case was before the D.C. Circuit, the EPA interpreted the phrase "potential to emit" as

the projected emissions of a source when operating at full capacity, with the projection increased by hypothesizing the absence of air pollution control equipment designed into the source. *Id.*, at 353.

The court rejected that interpretation, and remanded the regulations to the EPA with instructions to the agency to include the effect of in-place control equipment in defining potential to emit. *Id.*, at 355.[12]

The EPA accepted the suggestion in *Alabama Power* and went beyond it in repromulgating the definition of "potential to emit." The new definition, set out in full above, states that "any physical or operation limitation" on the ability of a source to emit a pollutant shall be considered in calculating the potential to emit if the limitation is federally enforceable. 40 C.F.R. § 52.21(b)(4). In describing what is meant by "physical or operational limitation," the regulation specifically refers to (1) air pollution control equipment, (2) restrictions on hours of operation, and (3) restrictions on the amount of material combusted, stored, or processed. *Id.* The definition at no point suggests that the term "physical or operational limitation" extends to restrictions on actual emissions.

The EPA gave some guidance as to the proper construction of the term "potential to emit" when it promulgated the new regulation. *See* 45 Fed.Reg. 52688–89. According to the agency,

> In this promulgation the Administrator is implementing the proposed approach by requiring that operation of control equipment be an enforceable requirement.... Accordingly, potential to emit for all sources means the ability at maximum design capacity to emit air pollution, taking into account any *in-place* control equipment. *Id.*, at 52688 (emphasis in original).

Additionally, the agency noted that the new definition provides that "specific permit conditions" which result in "infrequent operation" are now properly considered in determining potential to emit. *Id.*, at 52688–89. The EPA had originally proposed a definition which would have presumed continuous (24 hours a day, 365 days a year) operation, but this version was withdrawn. Instead, the definition we now have allows all federally enforceable limitations which may reduce the hours of operation to be included in the calculation. *Id.*, at 52688.

After much consideration and a thorough review of the materials on the subject, I conclude that a variety of factors (in addition to maximum design capacity) are properly included in the calculation of a source's potential to emit. These factors clearly include the effect of pollution control equipment. Additionally, they include federally enforceable permit conditions which restrict hours of operation or amounts of material combusted or produced. For the several reasons that follow, however, I find that these factors do not include permit restrictions which limit specific types and amounts of actual emissions.

A variety of factors indicate that the definition of "potential to emit" promulgated by the EPA should be given a narrow construction. First, it is well-settled that great deference is to be given to the EPA's interpretation of the Clean Air Act. *Eg., Whirlpool Corp. v. Marshall*, 445 U.S. 1, 11, 100 S.Ct. 883, 890, 63 L.Ed.2d 154 (1980); *Phillips Petroleum v. EPA*, 803 F.2d 545, 557 (10th Cir.1986). Even more deference is due where the agency is interpreting its own regulations. *Hoover & Bracken Energies, Inc. v. Dep't of Interior*, 723 F.2d 1488, 1489 (10th Cir.1983), *cert. denied* 469 U.S. 821, 105 S.Ct. 93, 83

---

12. According to the *Alabama Power* court,

When determining a facility's potential to emit air pollutants, EPA must look to the facility's 'design capacity'—a concept which not only includes a facility's maximum productive capacity (a criterion employed by EPA) but also takes into account the anticipated functioning of the *air pollution control*

*equipment designed into the facility.* 636 F.2d at 373 (emphasis added).

The discussion makes numerous references to "air pollution control equipment" and "cleansing control equipment." At no point does the opinion suggest that anything other than physical equipment should be considered. *Id.*, at 353–55.

L.Ed.2d 39 (1984); *Hawaiian Elec. Co. v. EPA*, 723 F.2d 1440, 1447 (9th Cir.1984).

Second, in promulgating the present version of the definition, the EPA has already expanded the scope of "potential to emit" to a much greater degree than was required by the *Alabama Power* case. There the D.C. Circuit merely required that the term include any air pollution control equipment designed into the source. It never suggested that federally enforceable permit limitations on hours of operation or production (which are now a part of the definition) needed to be considered in the calculation. *Alabama Power v. Costle*, 636 F.2d at 353–55.

Third, a careful review of the guidelines issued by the EPA when the new definition was promulgated indicates that LPC's novel construction must be rejected. The concept of "potential to emit" is the cornerstone of the entire PSD program. Expanding the definition of this term to include explicit limitations on emissions would virtually wipe away the entire PSD program because a carefully worded permit (issued under some other regulatory scheme) would completely exempt *any* source from PSD review. The discussion issued by the EPA indicates that the agency merely consented to consider many relevant factors in making its independent calculation of a source's potential to emit. However, this statement cannot be read to indicate that the EPA, in drafting this definition, intended to completely relinquish its right and responsibility to make such a calculation.

Fourth, it must be noted that a fundamental distinction can be drawn between the federally enforceable limitations which are expressly included in the definition of potential to emit and the limitations which defendant argues must be included. Restrictions on hours of operation or on the amount of material which may be combusted or produced are conditions which are, relatively speaking, much easier to "federally enforce." Compliance with such conditions could be easily verified through the testimony of officers, all manner of internal correspondence, and accounting, purchasing, and production records. In contrast, compliance with blanket restrictions on actual emissions would be virtually impossible to verify or enforce.

Finally, the real problem with LPC's construction is that it fails to perceive a distinction between the potential to emit and actual emissions. As a result, it fails to account satisfactorily for a source which obtains permits under another regulatory scheme limiting emissions to 250 TPY or less and then fails to stay within those limitations. Clearly if Congress intended that a new source with the *potential* to emit 250 TPY should be subject to PSD new source review, it most certainly intended that a new source which *actually* emits more than 250 TPY should be subject to the PSD program. Yet, under LPC's construction, a source which actually emits more than 250 TPY would be completely exempt from PSD if it was careful enough to obtain properly worded permits under some other regulatory scheme.

In the case of a new source which actually emitted more than 250 TPY of some pollutant but which was exempt from PSD review because of emission limitations contained in state permits, LPC contends that EPA's recourse would be to enforce the "federally enforceable" limitations in the permits. Under such a scenario, however, EPA would be deprived of the benefit of the remedies Congress created for a violation of PSD. Additionally, LPC's contention ignores the obvious answer that if Congress had intended for such a state of affairs to exist, it would never have enacted the PSD program.

For these many reasons, I must conclude that not all federally enforceable restrictions are properly considered in the calculation of a source's potential to emit. While restrictions on hours of operation and on the amount of materials combusted or produced are properly included, blanket restrictions on actual emissions are not. Thus, the specific permit conditions upon which LPC so heavily relies (the conditions expressly limiting CO and VOC emissions to levels below 250 TPY) are not a component of "potential to emit" and cannot sup-

port defendant's motion for summary judgment.

■ In the present case, the permits issued by APCD do contain numerous *other* federally enforceable restrictions that *are* properly considered in determining a source's potential to emit. Specifically, the permits contain limitations on the amount of wood fuel that may be consumed, the amount of waferboard materials that may be produced, and the numer of hours per year each plant may be in operation. However, the EPA's conclusion that the Kremmling and Olathe plants had the potential to emit 250 TPY of specific pollutants was based on calculations *which factored in* these operational limitations.[13] This conclusion by the EPA indicates that the material facts relating to the first alternative and second claims for relief remain in dispute because it constitutes at least some evidence that the "potential to emit," as that term is correctly defined, was in excess of 250 TPY.

As a result of the foregoing analysis, defendant's motion for summary judgment in its favor on the first claim for relief in the alternative and second claim for relief will be denied.

### III. Defendant's Motion on Plaintiff's Third Claim for Relief

Plaintiff's third claim for relief alleges that LPC failed to comply with an EPA Administrative Order issued under 42 U.S.C. § 7413(a). This order required LPC to submit a PSD permit application for the Olathe facility to the EPA. LPC urges that this order was invalid, and that it therefore cannot be held liable for its failure to comply.

Defendant's argument is tied to its assertion, which I have already addressed, that the Olathe facility cannot have qualified as a major stationary source because of the emission limitations set forth in the state permits. If the Olathe facility was not subject to the PSD requirements, the argument goes, then the order was invalid and there can be no liability for a failure to comply with it. Since I have rejected defendant's assertion that the Olathe facility could not have have qualified as a major source, it follows that defendant's motion to dismiss the third claim for relief must also be denied.

### IV. Plaintiff's Motion on its First Claim for Relief in the Alternative and Second Claim for Relief

■ As already noted above, plaintiff's first claim for relief in the alternative and second claim for relief allege that LPC's two Colorado facilities constitute "major stationary sources" which should have obtained PSD permits prior to construction. In its motion for partial summary judgment, plaintiff moves this court for a ruling that these two plants were subject to EPA's PSD regulatory authority when construction on them was begun. To prevail on this part of its motion, plaintiff must establish that there is no factual dispute as to its allegation that the Kremmling and Olathe plants had the "potential to emit" more than 250 TPY of VOCs and CO, respectively. Because I find that the material facts controlling such a determination remain in controversy, plaintiff's motion on this issue will be denied.

With regard to the Kremmling facility, plaintiff alleges that this plant had, at the time construction was begun, the potential to emit more than 250 TPY of VOCs. In support of its motion, plaintiff first points to the stack tests conducted in March of 1985 and to its unilateral conclusion, based on the results of these tests, that the Kremmling facility was a major stationary source. Second, plaintiff points to a calculation by Charles Bray (a consultant employed by LPC) which projected emissions from the Kremmling plant to be 311.4 TPY

---

**13.** According to the affidavit of Mr. Steven Frey of the EPA,

My conclusion that the Kremmling facility had the potential to emit more than 250 TPY of VOCs, and that the Olathe facility had the potential to emit more than 250 TPY of CO, was based on calculations which factored in the operational limitations contained in the state permits for the facilities. The limitations were: 160 tons per day for waferboard production rate and 8,000 hours per year of operation.

of VOCs (expressed as carbon). Third, plaintiff submits that the public notices issued by the State of Colorado projected emissions from the Kremmling facility of 334.2 TPY of VOCs, and that the final state emission permit issued in July of 1987 limits emissions to this amount.

In response, LPC contends that the material facts on the issue of the Kremmling plant's "potential to emit" remain in dispute.[14] It has submitted sworn statements from its consultant, Charles Bray, that the 1985 stack test results (in contrast to the EPA's conclusion) can reasonably be interpreted, in a manner consistent with the EPA guidelines for VOC determinations, to demonstrate that VOC emissions at Kremmling were less than 250 TPY. I assume, since the parties have not specified, that such testing and calculations are designed to measure a source's "potential to emit," and not merely its actual emissions at some point in time. Mr. Bray's conclusions, therefore, constitute some evidence that the potential to emit VOCs was less than 250 TPY and, as a result, the facts on this issue are clearly in dispute.

Similarly, with respect to the Olathe plant, plaintiff alleges that this plant had the potential to emit more than 250 TPY of CO. In support of its position, plaintiff submits essentially the same kinds of evidence. Specifically, it points to its conclusions based on the 1985 stack test results, Bray's calculations that projected emissions of 320.5 TPY of CO, and the public notices and final permits issued by the State of Colorado suggesting emission levels of 522.9 TPY of CO.

However, defendant again responds with evidence indicating a factual dispute exists as to the potential to emit CO at the Olathe facility. It has submitted sworn statements from Mr. Abe Vasquez, a professional engineer and analyst for the APCD, that he did a detailed analysis of the permit applications for the Olathe plant and concluded, applying standard EPA methodology, that the plant's potential to emit CO was 78 TPY. Similarly, Mr. Bray states in his affidavit that, according to his calculations, the Olathe plant's potential to emit CO was less than 250 TPY at the time construction was begun.

In addition, LPC points to the statements of Mr. Alex Slivensky, who conducted the 1985 stack test at Olathe upon which plaintiff relies. By way of affidavit, Mr. Slivensky asserted that he had never conducted a stack test before and that certain mistakes he made resulted in the creation of unusually large amounts of CO. He further testified that he promptly wrote the APCD and the EPA, advising them that the test results were inaccurate. After learning of these facts, Mr. Bray similarly concluded in his affidavit that the results of the 1985 stack test at Olathe should be considered inaccurate. Again, while the evidence advanced by LPC is not dispositive, it undoubtedly constitutes "some evidence" that the potential to emit CO at Olathe was less than 250 TPY.

It is also worth noting that the widely divergent conclusions reached by the experts in this case indicate not only that this issue is complex, but also that the individual calculations include at least some measure of subjectivity. As a result, it seems clear that the real truth on the issue of "potential to emit" can only be ascertained at trial. Accordingly, since the material facts on the issue of whether LPC's Colorado facilities were major stationary sources remain in dispute, plaintiff's motion for summary judgment on this issue will be denied.

## V. Plaintiff's Motion on its Third Claim for Relief

Plaintiff's third claim for relief alleges that LPC failed to comply with the

---

**14.** Defendant's first contention was that plaintiff's evidence, comprised of events occurring in 1985 and 1987, is irrelevant to the issue of the plant's potential to emit in 1983 and 1984. This argument must, of course, be rejected, since the plant was basically the same at both points in time, and an inference can reasonably be drawn between its potential to emit in 1985 and its potential in 1983. While defendant might submit that the permit limitations changed drastically over the lifespan of the two plants, this information merely affects the strength of the inference that should be drawn by the trier of fact.

terms of an administrative order issued by the EPA. The EPA states that the order was issued on September 27, 1985. It directed LPC to submit a PSD permit application for the Olathe plant to the EPA within sixty days of the effective date of the order, and stated that it became effective fifteen days after issuance. LPC submitted a PSD application to the APCD on January 22, 1986, and later submitted a PSD application to the EPA on July 30, 1986. On these facts, plaintiff moves for summary judgment in its favor on its third claim for relief.

42 U.S.C. § 7413(a) empowers the EPA to issue an administrative order directing the recipient to comply with the terms of an applicable state implementation plan. Such an order may not take effect until the recipient has had an opportunity to confer with representatives of the EPA concerning the alleged violation. *Id.*, § 7413(a)(4). Additionally, the order "shall specify a time for compliance." *Id.* Should the recipient fail or refuse to comply, the EPA may bring a civil enforcement action for an injunction or for the assessment of a civil penalty. *Id.*, § 7413(b)(1).

LPC asserts several defenses to plaintiff's third claim for relief. First, LPC contends that the Olathe facility was not subject to the PSD program at all because it did not qualify as a major stationary source. Since the material facts relating to the Olathe plant's "potential to emit" remain in dispute, the validity of the order remains in question and summary judgment on the third claim for relief is precluded.

Second, LPC asserts that it substantially complied with the order. In addition to its motion on the third claim for relief, EPA also moves for summary judgment in its favor on LPC's first affirmative defense, the defense of substantial compliance. Since the third claim for relief and the first affirmative defense are interrelated, I will consider them together.

EPA alleges that the PSD application required by the administrative order was

due in mid-December of 1985. LPC responds that it submitted such an application in January of 1986,[15] and that this act of compliance was one month late solely because EPA failed to timely and completely respond to questions propounded by LPC that were germain to the application. EPA also charges that the applications that were finally submitted were deficient and incomplete, but LPC again points to EPA's deficient response. Thus, since the material facts on the issue of substantial compliance remain in controversy, summary judgment cannot be entered on the first affirmative defense. Additionally, summary judgment on the third claim for relief is precluded for this reason as well.

Third, LPC can point to the fact that the administrative order was unsigned and undated when issued. Thus, it can argue that the order failed to specify a time for compliance as required by 42 U.S.C. § 7413(a)(4). Anticipating such a defense, plaintiff in its motion seeks a ruling that the order was valid notwithstanding the lack of signature and date.

EPA's argument on this point is based on the doctrine of waiver. It argues that a conference was held on October 23, 1986, between representatives of LPC and the EPA, and that nothing was said at this time about the fact that the order was unsigned and undated. EPA argues that LPC's failure to raise these objections at this meeting constitutes a waiver of its right to assert them in the present litigation.

Waiver has been generally defined by the Colorado Supreme Court as the voluntary and intentional abandonment of a known right. *Eg., Roderick v. City of Colorado Springs*, 193 Colo. 104, 563 P.2d 3 (1977); *Brice v. Pugh*, 143 Colo. 508, 354 P.2d 1024 (1960). "For a waiver 'there must be a clear, unequivocal, and decisive act of the party showing such a purpose.'" *Colorado Bank and Trust Co. v. Western Slope Investments, Inc.*, 36 Colo.App. 149, 153, 539 P.2d 501, 503 (1975). Waiver is gener-

---

**15.** LPC submitted a PSD permit application to the APCD on January 22, 1986. However, such

an application was not delivered to the EPA until July 30, 1986.

ally an issue of fact for the jury to decide. *Roderick,* 193 Colo. at 107, 563 P.2d at 5.

The authorities cited above demonstrate that this court cannot rule, as a matter of law, that LPC waived its right to assert the inadequate nature of the administrative order simply because it failed to bring it up at the post-order conference. This meeting took place at a time well before the commencement of this litigation, and therefore cannot be considered the voluntary and intentional abandonment of a known right. The balance of the record is similarly devoid of any evidence or allegation constituting "a clear, unequivocal, and decisive act" by LPC of an intention to relinquish its rights. Moreover, I am constrained by the observation of the Colorado Supreme Court that waiver is a factual issue best reserved for the jury.

Accordingly, because numerous factual issues relating to LPC's defenses remain in dispute, plaintiff's motion for summary judgment on its third claim for relief will be denied.

## VI. Plaintiff's Motion on LPC's Remaining Defenses

EPA has moved for summary judgment in its favor on each of LPC's four affirmative defenses. I have already concluded, above, that EPA's motion on LPC's first affirmative defense will be denied. Thus, I now turn to LPC's remaining defenses.

### A. LPC's Second Affirmative Defense

■ For its second affirmative defense, LPC asserts that the assessment of a monetary penalty against it would be inequitable and unfair. Specifically, it points to the fact that the preconstruction air emission review performed by the State of Colorado failed to indicate that the PSD program and its preconstruction permitting requirements applied to the Kremmling and Olathe facilities. It also asserts that, at the time of the complaint, it had submitted PSD permit applications to the EPA.

LPC's assertion that "elementary fairness" can serve as a defense to the enforcement by the EPA of the Clean Air Act and its implementing regulations is based on the holding in *Moser v. United States,* 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951). In that case, a Swiss national was misinformed by the Swiss Legation that his signing a certain document would not preclude him from being granted American citizenship. Subsequently, when the United States refused to grant him citizenship on the basis of this document, the Supreme Court (declining to discuss the case in terms of estoppel against the government) stated that "elementary fairness" dictated that the government be precluded from enforcing this otherwise valid statute. *Id.,* at 47, 71 S.Ct. at 556.

EPA contends in its motion that since this appears to be an equitable defense, LPC is barred from asserting it by the doctrine of "clean hands." EPA maintains that LPC should have known that the PSD program applied to its new waferboard plants because its officers were aware of the program and had recently gone through the determination process for a similar facility in Hayward, Wisconsin. EPA also argues that LPC intentionally withheld information about press vent emissions (a significant component of total emissions) when the APCD sought information about emissions at LPC's proposed plants in Colorado. Finally, EPA asserts several other improprieties that resulted in the intermittent revocation by APCD of LPC's permits.

LPC maintains, however, that it cannot be said that it should have known about PSD applicability in light of the EPA's determination that LPC's waferboard facility in Chilco, Idaho was not subject to the PSD program. It further states that any emissions information withheld from the APCD was an oversight, and that such omission was promptly remedied when it was discovered. Finally, LPC has submitted evidence indicating that many or all of the other improprieties alleged are really susceptible of an innocent explanation.

These numerous allegations indicate to me that the primarily factual issue of whether LPC has come to court with clean hands is one best reserved for trial. The conflicting evidence noted above makes it

clear that material issues of fact remain in dispute. Accordingly, plaintiff's motion for summary judgment on defendant's second affirmative defense will be denied.

### B. *LPC's Third Affirmative Defense*

As its third affirmative defense, LPC alleges that the claims of the United States in this case are barred by the doctrine of laches. In its motion, EPA initially maintains that the United States is not subject to the defense of laches when it is asserting the rights of the public. Alternately, EPA contends that LPC's factual allegations simply do not meet the requirements of a laches defense. Since I conclude that laches cannot be asserted against the United States in this case, I need not reach the issue of whether the facts alleged by LPC would otherwise support this defense.

It is settled beyond dispute that "the United States is not ... subject to the defense of laches in enforcing its rights." *Roberts v. Morton*, 549 F.2d 158, 163 (10th Cir.1977), *cert. denied* 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95 (1977); *United States v. Summerlin*, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940); *Bd. of Comm'rs v. United States*, 308 U.S. 343, 351, 60 S.Ct. 285, 288, 84 L.Ed. 313 (1939). This is most undeniably the rule when the Government is acting "to enforce a public right or protect a public interest." *Utah Power and Light Co. v. United States*, 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917); *Chesapeake & Delaware Canal Co. v. United States*, 250 U.S. 123, 125, 39 S.Ct. 407, 407–08, 63 L.Ed. 889 (1919). "The reason underlying the principle, said Mr. Justice Story, is 'to be found in the great public policy of preserving public rights, revenues, and property from injury and loss, by the negligence of public officers.' [The United States Supreme] Court has consistently adhered to this principle." *Costello v. United States*, 365 U.S. 265, 281, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961) (citations omitted).

In the case at hand, the United States is clearly acting in its sovereign capacity to enforce and protect the public interest in a clean environment. Accordingly, the defense of laches may not be asserted against it, and plaintiff's motion for summary judgment in its favor on defendant's third affirmative defense will be granted.

### C. *LPC's Fourth Affirmative Defense*

Defendant's fourth affirmative defense alleges simply that "plaintiff's claims are barred by the doctrine of estoppel." Plaintiff, in its motion for summary judgment, seeks to have this defense stricken as a matter of law. It maintains, initially, that the defense of estoppel cannot be asserted against the United States in the absence of "affirmative misconduct" by the government officials involved. Secondly, it contends that there are no facts supporting the application of estoppel against the United States in the present case.

The essence of the doctrine of equitable estoppel is some misleading conduct by the party to be estopped and good faith reliance to detriment by the party seeking to invoke the doctrine. *N.L.R.B. v. J.D. Indus. Insulation Co.*, 615 F.2d 1289 (10th Cir.1980). The requirements to maintain an estoppel in this jurisdiction are well established and are as follows: (1) the party to be estopped must know the true facts; (2) he must intend that his conduct will be acted upon or must act in such a way that the party asserting the estoppel has the right to believe that it was so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely upon the former's conduct to his resulting injury. *Eg. Che–Li Shen v. I.N.S.*, 749 F.2d 1469 (10th Cir.1984); *Tosco Corp. v. Hodel*, 611 F.Supp. 1130 (D.Colo.1985); *Dept. of Health v. Donahue*, 690 P.2d 243 (Colo. 1984).

In the present case, LPC's estoppel defense is grounded upon a prior determination by the EPA that the PSD program did not apply to another LPC waferboard production plant that was similar to those constructed at Kremmling and Olathe. Specifically, it is undisputed that, prior to any construction in Colorado, LPC planned a waferwood plant of similar size in Chilco, Idaho. As part of that process, LPC con-

tacted the Region X Office of the EPA in Seattle to inquire whether the PSD program applied to the Chilco facility. In August of 1983, the EPA advised LPC that the PSD permitting requirements would not apply to the Chilco plant.

The factual allegations set forth above make it obvious that LPC cannot possibly satisfy the requirements of the doctrine of estoppel with regard to the alleged violations at Kremmling. The conduct LPC claims to have relied upon is the EPA determination that the Chilco facility was not subject to the PSD permit requirement. It is undisputed that this determination occurred in August of 1983. It is also undisputed that LPC initiated construction at Kremmling in July of 1983. Since the violation that is alleged in this case, the commencement of construction without the required PSD permits, occurred before the EPA issued the determination for the Chilco plant, LPC cannot possibly contend that it relied upon this conduct by the EPA in committing any such violation at Kremmling.[16]

With regard to the alleged violation at Olathe, defendant's factual allegations could conceivably support a claim of estoppel. Under the scenario advanced by LPC, it could argue that the government's conduct with respect to the Chilco facility implied that it was not necessary to obtain PSD permits before construction was initiated at Olathe. LPC could further contend that only the EPA was aware of the fact that the government's determination with respect to Chilco was to have no effect on the PSD status of the Olathe facility. Finally, LPC could show detrimental reliance in that it relied on the EPA's Chilco determination in proceeding to commence construction at Olathe, which action could result in the assessment of a detrimental civil penalty. It seems highly unlikely to me that such a defense could ever be accepted by the trier of fact at trial, in light of the fact that LPC could not have been relying upon conduct by the EPA when it did the

very same thing at Kremmling. Nonetheless, the case is presently before me on a motion for summary judgment, and such an undisputed factual scenario does constitute at least "some evidence" of detrimental reliance.

■ EPA maintains, however, that even if the facts do support the charge of detrimental reliance, estoppel cannot be asserted against the government unless there has been some "affirmative misconduct" on the part of the government officials involved. It is true "that estoppel of the government is an extraordinary remedy, to be applied with the greatest care and circumspection." *Tosco Corp. v. Hodel*, 611 F.Supp. at 1206. Two requirements must be met before equitable estoppel may be raised against the government. First, the party raising the defense must establish that the conduct complained of was committed by government agents while acting within the scope of their authority. *Id.*, at 1199; *Atlantic Richfield Co. v. Hickel*, 432 F.2d 587, 591 (10th Cir.1970). Second, the actions of the government agency involved must constitute "affirmative misconduct." *Tosco Corp. v. Hodel*, 611 F.Supp. at 1201; *Che-Li Shen v. I.N.S.*, 749 F.2d at 1474. Since there is no claim that the government officials involved ever acted outside the scope of their authority in this case, the defense of estoppel may be raised if LPC can demonstrate some "affirmative misconduct" by the EPA.

The presence or absence of "affirmative misconduct" must be decided on a case-by-case basis. *Tosco Corp. v. Hodel*, 611 F.Supp. at 1205. It is more likely to arise when the government has acted affirmatively rather than when it has failed to act. *Id.* While at least one court in this district has held that the government officials involved need not engage in intentional misrepresentation or concealment, *Id.*, at 1205, the clear rule in the ninth circuit is that "affirmative misconduct" is present only in cases where the facts establish "an active

---

**16.** LPC could conceivably argue that it relied upon the Chilco determination in continuing any violation at Kremmling for as long as it has. However, such a contention would be relevant to the issue of the proper amount of any civil penalty (a matter within the court's discretion), and not the issue of whether a violation occurred.

or intentional concealment" and that "mere negligence will not suffice." *United States v. Harvey*, 661 F.2d 767, 775 (9th Cir.1981) *cert. denied* 459 U.S. 833, 103 S.Ct. 74, 74 L.Ed.2d 72 (1982).[17]

Although the Supreme Court has not as yet set forth any guidelines for working with the term "affirmative misconduct," the courts of this jurisdiction have considered the issue on several occasions. For example, in a case where the Department of the Interior sought to invalidate numerous mining claims on the basis of departmental contest proceedings that transpired forty years earlier, and those proceedings had been declared void and vacated by the Secretary of the Interior, the government's conduct amounted to affirmative misconduct and it was estopped. *Tosco Corp. v. Hodel*, 611 F.Supp. at 1205. Similarly, Judge Kane found affirmative misconduct where the government wrongly informed a young serviceman that he was not considered to be on active duty at the time he was injured, and that he was therefore ineligible for veteran's benefits. *Armstrong v. United States*, 516 F.Supp. 1252 (D.Colo.1981). As a result of this misinformation, the serviceman failed to file a claim for benefits for more than a year. When the government subsequently admitted that plaintiff had been on active duty when he was injured, the government was estopped to raise in its defense a statute that substantially reduced veteran's benefits for claims filed more than one year after the injury. *Id.*[18]

While the authorities cited above might indicate that the giving of erroneous information by government officials can clear the way for a party to raise an estoppel against the government, this rule apparently does not extend to a litigant that is under a legal duty to comply with a regulatory framework. *Emery Mining Corp. v. Secretary of Labor*, 744 F.2d 1411 (10th Cir.1984). In *Emery*, the Tenth Circuit held that a mine operator was duty-bound to know and comply with the regulations implementing the Federal Mine Safety and Health Act, and to the extent that the operator relied upon the interpretation of those regulations given to it by officials of the Mine Safety and Health Administration, "[it] assumed the risk that that interpretation was in error." *Id.*, at 1416. As a result, the court held that the operator could not estop the government from charging it with a violation of safety regulations, even though it had been relying on an interpretation given by the government officials charged with enforcement of those regulations. According to the court,

> "those who deal with the Government are expected to know the law and may not rely upon the conduct of government agents contrary to law." *Id.*, at 1416 (*citing Heckler v. Community Health Services*, 467 U.S. 51, 63, 104 S.Ct. 2218, 2225, 81 L.Ed.2d 42 (1984)).

█ In the present case, the evidence presented to the court thus far and the factual allegations advanced by LPC are both entirely devoid of any action by the EPA that could be characterized as affirmative misconduct. LPC's numerous charges to the effect that EPA failed to object to emission analyses for the plants in question and failed to order LPC to cease operations to lessen the amount of the accruing civil penalties are clearly charges of negative conduct. They do not even qualify as affirmative conduct, let alone affirmative misconduct.

The only "affirmative" conduct that LPC can point to is EPA's determination with respect to the Chilco plant, but the issuance of this determination clearly cannot be characterized as misconduct. Not only was

---

**17.** Defendant cites the case of *Moser v. United States*, 341 U.S. at 41, 71 S.Ct. at 553, for the proposition that estoppel applies against the United States where the government has "lulled" a "petitioner into misconception of the legal consequences." *Id.*, at 46, 71 S.Ct. at 556. Such reliance is misplaced, however, in that the Supreme Court made it clear that the outcome in *Moser* was *not* based on "any estoppel of the Government." *Id.*, at 47, 71 S.Ct. at 556.

**18.** In contrast, there was no evidence of affirmative misconduct in *Lurch v. United States*, 719 F.2d 333 (10th Cir.1983) *cert. denied* 466 U.S. 927, 104 S.Ct. 1710, 80 L.Ed.2d 182 (1984) or *Akbari v. Godshall*, 524 F.Supp. 635 (D.Colo. 1981).

EPA within its rights in making and issuing such a ruling, but it arguably had the duty to do so, especially in light of the fact that one had been requested by LPC. Additionally, there is absolutely no indication that the government's conclusions were erroneous, as was the case in *Armstrong* or *Moser*. Moreover, the record is entirely devoid of any factual allegation to the effect or any evidence to suggest that EPA intentionally set out to mislead LPC.[19] In sum, while this determination by EPA could conceivably have given rise to detrimental reliance on the part of LPC,[20] its issuance was not in any way inappropriate or erroneous, and therefore cannot be considered affirmative misconduct.

Accordingly, because I find that LPC could not have detrimentally relied upon the Chilco determination in beginning construction of the Kremmling plant without a permit, and that the issuance of such determination cannot be considered affirmative misconduct by the EPA in any event, plaintiff's motion for summary judgment in its favor on defendant's fourth affirmative defense will be granted.

### CONCLUSION

Accordingly,

IT IS ORDERED that defendant's Motion for Summary Judgment in its favor on plaintiff's first claim for relief be, and the same hereby is, GRANTED;

IT IS FURTHER ORDERED that defendant's Motion for Summary Judgment in its favor on plaintiff's first claim for relief in the alternative, second claim for relief, and third claim for relief be, and the same hereby is, DENIED;

IT IS FURTHER ORDERED that plaintiff's Motion for Summary Judgment in its favor on its first claim for relief in the alternative, second claim for relief, and third claim for relief be, and the same hereby is, DENIED;

IT IS FURTHER ORDERED that plaintiff's Motion for Summary Judgment in its favor on defendant's first and second affirmative defenses be, and the same hereby is, DENIED; and

IT IS FURTHER ORDERED that plaintiff's Motion for Summary Judgment in its favor on defendant's third and fourth affirmative defenses be, and the same hereby is, GRANTED.

---

19. While I need not adopt the view embraced by the Ninth Circuit in *United States v. Harvey*, 661 F.2d at 767, 775, to the effect that intentional (not negligent) conduct is required to make out a showing of affirmative misconduct, I do note that it seems to me to be the better view.

20. Any justifiable and detrimental reliance would certainly constitute a mitigating circumstance to be considered by the court in determining the amount of any civil penalty, should a violation ultimately be proven.